Plaintiff's first assignment of error asserts that the trial court improperly granted a directed verdict because her prima facie case contained evidence sufficient to establish that defendant acted intentionally under the test defined by the Supreme Court in Fyffe v.Jeno's, Inc. (1991), 59 Ohio St.3d 115:
 [I]n order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
Fyffe, 59 Ohio St.3d 115 at paragraph one of the syllabus. The trial court granted a directed verdict based upon its conclusion that the plaintiff had "failed to establish that prior to plaintiff's decedent's injury, the defendant knew of the existence of a dangerous process, procedure, equipment, or condition within its facility that was substantially certain to cause harm to plaintiff's decedent or any other employee" and had thus presented insufficient evidence on the second prong of the Fyffe test. Judgment Entry at **1-2. But see Fyffe,59 Ohio St.3d 115, paragraph two of the syllabus. Similarly, the majority now sustains that directed verdict based upon its conclusion that plaintiff's decedent "has failed to raise even the inference" that he was required to engage in a dangerous task, and has thereby failed to present sufficient evidence on the third prong of the Fyffe test. Majority Opinion, ante at *9. Upon review of the evidence in this case, I am convinced that neither claim is entirely accurate, and accordingly, I respectfully dissent.
With regard to the first two prongs of the Fyffe test, there is significant evidence in the record that defendant knew that the extruder line was dangerous and that harm to employees as a result of that danger was a substantial certainty. Plaintiff's safety expert James McCarthy visited the defendant's plant, examined the manufacturing line, reviewed defendant's OSHA file and also the depositions of defendant's employees. At trial, Mr. McCarthy stated his expert opinion that Mike Gibson's injury and subsequent death "was a result of lack of de-energization and lockout of an extruder system there at the plant." Transcript at *270.
Mr. McCarthy also indicated that the defendant's failure to de-energize and failure to comply with lockout-tagout procedures was not in compliance with OSHA regulations, did not meet the standard of practice in the machinery industry and was not in compliance with defendant's own written policy. See id. at **280-300. He further testified that in his opinion that it was a "100 percent" certainty that molten plastic would spray from an open end of the line as soon as the cold plastic plugging the line became hot enough, e.g., id. at *276-77, and that this known risk was substantially certain to result in serious injury to an employee. See id. at 304. He also offered his expert opinion that if defendant had complied with lockout-tagout and de-energization procedure that Mike Gibson would not have been injured. See id. at *308. Finally, he testified that the risk posed a substantial certainty of harm to not just one of defendant's employees, but all of them. See id. at 306-07.
Mr. McCarthy described as a "hazard" the "hot plastic material that exploded out of the system and sprayed and * * * ultimately killed Mr. Gibson." Id. at * 273. He indicated that in safety analysis terms a "risk" is the probability of exposure to a hazard, and noted that "the methodology to analyze the risk is essentially how do you minimize the hazard coming into play, the method for that, to accomplish that. In other words, to keep the plastic from exploding out because it's going to burst through a plug that happens to be in there in a cooled section with hot plastic behind it. * * * * That is done by de-energizing the system, all power systems to it and locking out and tagging out the system."Id. at *274. Mr. McCarthy noted that defendant was aware of the hazard posed by the plastic and was aware of the proper procedures necessary to neutralize that hazard. Mr. McCarthy also observed that it was just a matter of time before an employee was injured by the employer's failure to utilize those procedures:
 Q: * * * * Let's assume that I let's assume that I want to fix a machine and I take, I open this pipe up and there's a plug at the end of 4 to 5 feet.
 A: Okay.
 * * * *
 Q: [A]ssuming that there is a plug, 4 to 5 feet of solidified plastic which behind it has molten plastic which is about 500 degrees or so, when you calculate this risk, in light of, in light of the fact that this part was de-energized and this part was not de-energized, could you give us your assessment of that risk?
 A: As soon as the heat melts the plastic plug, it's going to blow out. There's no question of that. It's just, it's 100 percent it's going to blow out. It's not something if it's going to do it, it's just a function of when it's going to do it. It's going to blow out that plug.
Id. at **275-76. Mr. McCarthy analogized the mechanism to "putting a snowball in a pipe and running hot water behind it. Eventually, you're going to move that snowball, you're going to dissipate that snowball, and you're going to have in that analogy hot water shooting out." Id. at *277. He repeatedly characterized the likelihood of danger in defendant's plant from the failure to de-energize and lockout the extruder line as "100 percent." E.g., id. at *278. "It's a substantial certainty that that's going to go and the danger is going to be, is going to be such that it's going to explode if somebody is in the vicinity."Id.
Mike Gibson's foreman John Meggitt admitted that he knew at the time of the accident that if there was a solidified plastic plug that formed "that the molten plastic that's up against the inner edge of the plug is going to melt the plug," and also admitted that anyone who had worked around the plastic manufacturing machine for "awhile" would have known that turning off only some of the heaters would form a hot spot that would eventually spray plastic. See Transcript at *133-34. He also stated that he felt that prior to the accident he had not been properly trained, and that proper training would have included instruction on de-energizing the entire manufacturing line when conducting repairs. See Transcript at **123-25. Finally, he acknowledged that the company had changed its procedures since plaintiff's decedent was injured, and it was now the practice to shut down the entire line and shut off all heaters when conducting repairs. See Transcript at *130.
Similarly, Robert Hughes, who was in charge of safety at the defendant's plant, admitted that it was a "virtual certainty" that given a long enough period of time molten plastic would break through the plug and a person standing in the front of the plugged pipe would be injured. See id. at **44-45. Mr. Hughes also specifically testified that he was aware that a "lockout-tagout" plan and procedures were necessary for the safety of plant employees:
 Q: And so Products Drainage, Inc. [sic] knew that they were being asked to prepare this written plan and to implement this written plan to protect and keep safe the life and well-being of the employees; is that correct?
 A: Yes.
 Q: This plan was very important, wasn't it?
 A: Yes
 Q: They were telling you that, look, you violate this plan, you're going to injure or kill people that work for you, isn't that true?
 A: Yes.
 Q: You knew that, didn't you?
 A: Yes.
Id. at **28-9.
Considering John Meggitt's testimony that anyone who had worked around the machinery would have known that a plastic plug could melt under such circumstances and his testimony that he had not been properly trained, as well as the evidence from plaintiff's expert as to the existence of the hazard of spraying plastic at defendant's plant and the expert's testimony that both the OSHA regulations and defendant's own policy implementing them required the entire line to be shut down, I must conclude that there is substantial credible evidence upon which a rational trier of fact could conclude that the defendant knew that the manufacturing line was dangerous and that harm was substantially certain to occur if defendant failed to comply with the "lockout-tagout" procedure when conducting repairs of the manufacturing line.
In granting the directed verdict, the trial court appears to have misapplied the second prong of the Fyffe test. Whether or not an event is "substantially certain" to occur can often only be shown by circumstantial evidence. Cf. Hannah v. Dayton Power Light Co. (1998),82 Ohio St.3d 482, 485, citing Adams v. Aluchem, Inc. (1992),78 Ohio App.3d 261, 264; Fyffe, 59 Ohio St.3d 115 at paragraph two of the syllabus. While the trial court correctly observed that "there has to be some notice to [the second prong of the Fyffe test]," that notice need not take the form of a previous workplace incident. The substantial certainty test does not establish a "one free bite" rule, and accordingly it was not necessary for the Plaintiff to show that plastic had blown out of the extruder in the same location on a previous occasion. Rather, I believe plaintiff established a question for the jury on these facts by showing that the defendants knew of the risk of the extruder spraying molten plastic, knew why plastic might spray out of the extruder, knew that there were safety procedures associated with the operation of the extruder to prevent the spraying of plastic, and knew that the failure to utilize the safety procedures carried a serious risk of danger that could result in injury or death to their employees but still disregarded those safety procedures. For these reasons, the trial court's decision to grant a directed verdict based upon the second prong of the Fyffe test was improper.
Apparently recognizing that the trial court's analysis was erroneous, the majority has nevertheless sustained the trial court's judgment, based instead on the third prong of the Fyffe test. The majority correctly observes that the plaintiff produced no testimony that Mike Gibson was expressly directed to assist Tim Jewell in the repair of the extruder pipe.However, the leading case interpreting the third prong of Fyffe does not require such an express direction. In Hannah v. Dayton Power LightCo. (1998), 82 Ohio St.3d 482, a member of a power plant's volunteer emergency rescue squad suffered an attack of hypothermia and died while attempting a vertical rescue of two men stranded at the four-hundred-fifty foot level of a nine-hundred foot smokestack. The trial court granted summary judgment in favor of the defendant employer on an intentional tort claim, but the Supreme Court reversed:
 Additionally, sufficient evidence was presented to create an issue of fact whether DP L required the decedent to perform the rescue. DP L contends that this requirement is not satisfied because DP L never ordered the decedent to climb up the ladder to rescue the stranded men. However, under the third element of Fyffe, DP L did not have to expressly order the decedent to make the rescue. Instead, to overcome a motion for summary judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the decedent to engage in that dangerous task. Here, former plant manager Fred Southworth testified that DP L expected the rescue squad to respond to an emergency, and to do so in a safe manner. Thus, when DP L sounded the alarm and summoned its own rescue squad into action, reasonable minds could differ as to whether DP L required the squad to make the rescue.
Id. at 487 (emphasis added). The Supreme Court's decision in Hannah
establishes that if the plaintiff presents evidence showing that an employer expects an employee to perform a job in a way that is substantially certain to cause harm, the plaintiff has satisfied her burden on the third prong of the Fyffe test. Moreover, the Supreme Court has previously "reject[ed] the proposition that a specific intent to injure is necessary to a finding of intentional misconduct." Jones v. VIPDevelopment Co. (1984), 15 Ohio St.3d 90, 95 (emphasis added).
The majority opinion cites previous cases from this Court in support of proposition that "in order to satisfy the third prong of the Fyffe test, the injured employee must have been compelled, as a condition of employment, to participate in the dangerous task." Majority Opinion,ante at *10, citing Myers v. Oberlin Processing, Inc. (Sept. 27, 1996), Seneca App. No. 13-96-20, unreported, 1996 WL 547920, and Paxton v.Hench (July 22, 1992), Allen App. No. 1-92-36, unreported, 1992 WL 180095. However, this position was rejected by the Supreme Court in theHannah case. The employee in that case was a volunteer member of an emergency rescue squad, and died as a result of attempting a dangerous rescue. He was not required to be a member of the squad, nor was he instructed to perform the specific rescue that led to his death. SeeHannah, 82 Ohio St.3d at 485-86; id. at 488-89 (Moyer, C.J., dissenting). Notwithstanding these facts, the Supreme Court determined that the plaintiff had presented sufficient evidence on the third prong of Fyffe even though the employee was merely expected, not compelled, to participate in the dangerous task. Id. at 487.
Although it is undisputed that Mike Gibson was not directly ordered to assist Tim Jewell, several witnesses testified that it was expected that employees would assist each other in performing job tasks. Specifically, Tim Jewell testified that when he had previously worked as a mixer (the job held by plaintiff's decedent on the day of the accident), it was expected for employees to assist in performing other tasks. See Transcript at *104-05. Robert Hughes testified in both his deposition and at trial that there would have been times in the course plaintiff's decedent's employment that he was "expected to find other work." Transcript at *72.
Moreover, it is perhaps more important to note that Mr. Hughes testified that if Mike Gibson ran out of work, he would have beenrequired to ask his foreman for another assignment:
 Q: Now Mike Gibson, I think you told us, didn't do a single thing wrong, did he?
 A: He left his protected work area.
 Q: Did you tell us that your employees were expected to got out and find a job to do if they run out of work?
* * * *
 A: They were to find work in their own area such as sweep the area, possibly grind scrap material.
 Q: Did you ever tell Mike not to leave the area where he was working?
 A: No.
* * * *
 A: Company policy is to clean your area if you do not have anything else to do.
 Q: What if your area is clean, then what are you supposed to do?
 A: There is a possibility of grinding scrap. He should have checked with his supervisor to find out if there was anything the supervisor needed him to do.
* * * *
 Q: [I]sn't that what Mike did, walk over and say, "Can I help you out?"
 A: Yes.
 Q: Isn't that what you'd expect of your good employees?
 A: He was to ask his supervisor.
* * * *
Q: Wasn't John Meggitt his supervisor?
 A: Yes. John Meggitt wasn't in the plant from the time the question was asked from my —
* * * *
 Q: [Mike Gibson] went over to the exact spot where his Supervisor was and said, "Can I help out?" [Mike] didn't know his supervisor wasn't there, did he?
* * * *
A: I don't know if he knew he was there or not.
Transcript, at **45-7 (emphasis added). The majority, however, contends that "the record indicates that Gibson remained standing in the area, apparently merely observing the repairs, for approximately two to five minutes before the accident occurred." Majority opinion, ante at *10. Both the majority and the defendant seem to argue that this evidence is sufficient to defeat the plaintiff's claim as a matter of law. I am not persuaded. The two-to-five minute time frame relied upon by the majority appears to come from plaintiff's safety expert, who testified he had obtained that information from reading pre-trial depositions. Trial Transcript at **364-66. However, Tim Jewell's trial testimony indicates that the time frame may have been much shorter:
Q: Now Mike came up and said, "Do you need any help?"
 A: (Witness nods head.)
 Q: You have to answer out loud.
 A: Yes.
 Q: When Mr. Bullinger came in, what did he have to say?
 A: As Randy walked up, if I remember correctly, that's when the accident happened.
 Q: Do you recall how long Randy was there before the accident happened?
 A: No, I don't.
 Q: Did Mr. Bullinger ever say anything to you when he walked up like, is this machine locked out?
 A: No.
 Q: Did he ask you any questions about it?
 A: No, not that I remember. But if I do remember correctly, as he walked up, though, he was still walking up to me, that's when the accident happened.
 Q: Now, before the accident happened, did you hear a noise?
 A: Yes. I heard like a popping sound, a pop.
 Q: Did you hear a hiss at all before the pop?
 A: Yes.
 Q: This all took place in, what, how long?
 A: A couple seconds.
Transcript, at **105-106. It is undisputed that John Meggitt had left the area of the extruder to locate bolts immediately prior to Mike Gibson's approach, and the defendant presented no evidence to refute the foregoing testimony. Based on the testimony of Tim Jewell and Robert Hughes, a jury could reasonably determine either that Mike Gibson had been in the area in an attempt to find John Meggitt to get more work as Mr. Hughes asserted that he was required to do, or to directly offer assistance with the problem as Tim Jewell indicated he was expected to do. Either determination would satisfy the plaintiff's burden on the third prong of Fyffe. Cf. Hannah, 82 Ohio St.3d at 485-86.
Taken together with all the other evidence as to plaintiff's decedent's duties, I believe that the foregoing evidence presents a disputed issue of fact upon which reasonable minds could differ as to the third prong of the Fyffe test, and should have precluded a directed verdict in this case. Because I believe that the plaintiff has presented sufficient evidence to survive a motion for directed verdict under Civ.R.50, I would reverse the judgment of the Paulding County Court of Common Pleas and remand this case for further proceedings.